**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ANGELO COREY STACKHOUSE,

*Defendant-Appellant*.

No.22-30177

D.C. No.
1:21-cr-00035-
SPW-1

OPINION

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Argued and Submitted December 4, 2023
Portland, Oregon

Filed June 27, 2024

Before: Marsha S. Berzon, Jacqueline H. Nguyen, and Eric
D. Miller, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Criminal Law

The panel affirmed Angelo Corey Stackhouse's convictions for kidnapping a minor using a means or instrumentality of intrastate commerce, in violation of 18 U.S.C. §§ 1201(a)(1), 1201(g), and 3559(f)(2), and transportation of a person across state lines with intent to engage in illegal sexual activity, in violation of 18 U.S.C. § 2421(a).

Rejecting Stackhouse's argument that his kidnapping conviction violates the Commerce Clause, the panel held that the application of the federal kidnapping statute, § 1201(a), to an intrastate kidnapping is constitutional where the defendant uses a cellphone—an instrumentality of interstate commerce—in furtherance of the offense.

The panel further held that the government presented sufficient evidence of Stackhouse's intent to commit sexual assault when he transported the victim of his assault across state lines in violation of § 2421.

In a concurrently filed memorandum disposition, the panel resolved Stackhouse's conviction for kidnapping an Indian person within the boundaries of a reservation, in violation of 18 U.S.C. §§ 1152, 1201(a)(1)-(2), 1201(g), and 3559(f)(2).

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Zeno B. Baucus (argued), Bryan T. Dake, and Tim Tatarka, Assistant United States Attorneys; Jesse A. Laslovich, United States Attorney; Office of the United States Attorney, District of Montana, Billings, Montana; for Plaintiff-Appellee.

Constance Van Kley (argued), Upper Seven Law, Helena, Montana, for Defendant-Appellant.

**OPINION**

BERZON, Circuit Judge:

Angelo Corey Stackhouse was convicted after a bench trial on several counts related to the sexual abuse and mistreatment of minor and adult women, including kidnapping a minor and transporting a person across state lines with the intent to engage in illegal sexual activity. The kidnapping charge involved driving a ten-year-old girl to a hotel to photograph and sexually assault her, using a cellphone during the commission of the offense. The interstate transportation charge stemmed from travel with a nineteen-year-old woman from Montana to Denver, where Stackhouse sexually assaulted her. This opinion covers the kidnapping and transporting convictions, specifically: (1) whether Stackhouse's kidnapping conviction violates the Commerce Clause; and (2) whether there is sufficient

evidence that Stackhouse intended to commit sexual assault when he travelled across state lines.[1]

We conclude that the application of the federal kidnapping statute to an intrastate kidnapping is constitutional where the defendant uses a cellphone—an instrumentality of interstate commerce—in furtherance of the offense. We further determine that Stackhouse's actions leading up to and during the trip to Denver established that he had the intent to commit illegal sexual activity when he transported the victim interstate, even if the intent was purportedly conditioned upon the victim's non-compliance with his demands.

We affirm the convictions.

## I.  Background

### A.  Factual Background

Stackhouse's convictions stem from the kidnapping and sexual assault of multiple women and young children between 2019 and 2020.

#### 1.  V.G.

In September 2020, Stackhouse picked up V.G., his girlfriend's 10-year-old sister, from her home in Billings, Montana, under the pretense of taking her to get her computer repaired. Rather than drive to the repair shop, he drove V.G. to a Dollar Store, where he purchased massage oil, and then to a local motel. After arriving at the motel,

---

[1] Stackhouse appeals his conviction for kidnapping an Indian person within the boundaries of a reservation on evidentiary grounds. 18 U.S.C. §§ 1152, 1201(a)(1)–(2), 1201(g), and 3559(f)(2) (Count VI). We resolve that appeal in a memorandum disposition filed concurrently with this opinion.

Stackhouse called someone and said, "I got her in the room." Stackhouse then proceeded to set up a camera on the bedside table. He instructed V.G. to get undressed and rubbed oil over her, and then took photographs of her body. Stackhouse had a knife and Taser with him and told V.G., "If you scream no one's gonna hear you." He made V.G. perform oral sex, and then made her lie on top of him. As they were leaving the motel room, Stackhouse once again spoke with someone over the phone, telling them: "Okay. I'm finished. I got the footage." Cellphone data corroborated V.G.'s testimony about the timing and location of the incident.

## 2. Hannah

In May 2020, Stackhouse drove from Billings, Montana to Denver, Colorado with two women, Hannah and Breezy. Breezy asked Hannah, who was nineteen, to accompany her on the trip, and Hannah reluctantly agreed. The three consumed cocaine, supplied by Stackhouse, as they drove.

Once in Denver, the three met William O'Neill, Stackhouse's cocaine dealer, at a hotel. Stackhouse and O'Neill provided alcohol and more cocaine, which Stackhouse encouraged Hannah to consume even when she expressed a desire to stop. After Breezy and O'Neill left the room, Stackhouse suggested to Hannah that he expected her to have sex with him as payment for the trip and the drugs. Hannah reluctantly agreed because she was "scared" and "just wanted to go home," and because she felt that if she "didn't do what he wanted," she "didn't know . . . what was going to happen." Stackhouse refused to use a condom when asked. Stackhouse took a picture of Hannah's ID during the trip, which she suspected was "for leverage."

Several days after they returned to Billings, Stackhouse asked Hannah to meet him at a hotel, where they consumed

cocaine and had sex. Hannah agreed to go "[b]ecause he had a picture of [her] ID." Stackhouse then invited Hannah to go with him on a second trip to Denver. She again agreed because he "had a picture of [her] ID, and he knew where [her] parents lived and that [she] lived with [her] parents . . . [and she] was scared."

Stackhouse again provided Hannah with cocaine on the drive to Denver. This time, they drove directly to O'Neill's house. There, Stackhouse instructed Hannah to have sex with O'Neill while Stackhouse watched. Hannah testified that "I obviously didn't want to, but what was I going to say?" A while later, after Hannah consumed more cocaine, Stackhouse instructed Hannah to "please [O'Neill] and his wife." Hannah had the "[s]ame reaction [she] had the last time," implying that she reluctantly complied. Afterwards, Hannah informed Stackhouse that she had allowed O'Neill to penetrate her against Stackhouse's instructions. Over her objections, Stackhouse anally penetrated her with an object, telling her "this is what happens when [she doesn't] listen to him." Stackhouse also took pictures, and possibly a video, of Hannah's naked body, "in case [she] was to turn on him, for his attorney."

The day after she returned from Denver, Hannah met Stackhouse at a hotel in Billings, because she "was still scared." They had sex and consumed more cocaine, and Stackhouse instructed her to stay the night at the hotel alone. Hannah complied, because she "didn't know if he was going to check on me and drive by."

Hannah testified that she was afraid of Stackhouse, that he forced her to go to Denver the second time, and that they had nonconsensual sex in Denver. She also testified that

Stackhouse told her he always carried a gun with him, although she never saw him with it.

### 3.   Other Sexual Acts

The government introduced evidence that Stackhouse sexually assaulted or threatened three other women. One woman testified that in September 2019, Stackhouse approached her at a bar and brought her to a hotel room while she was high on methamphetamine. Stackhouse punched her in the head, threatened to further harm her if she did not take off her clothes, sexually assaulted her, and told her that he was going to take her to North Dakota to sell her services as a prostitute. A second woman testified that she met Stackhouse at a hotel where he was distributing drugs. While she was high on methamphetamine and semi-conscious, Stackhouse raped her. A third woman testified that she received methamphetamine from Stackhouse at a hotel in the summer of 2020, after which Stackhouse told her that she "need[ed] to pay for the[] drugs somehow." After Stackhouse threatened her at gunpoint, she took off her clothes and got into the bed. Stackhouse then informed her that he was not going to rape her, but that he needed to "make sure [she wasn't] a snitch."

### B.   Procedural Background

Stackhouse was indicted on seven charges, including as relevant here the kidnapping of a person under the age of 18 (V.G.) using a means or instrumentality of interstate commerce, in violation of 18 U.S.C. §§ 1201(a)(1), 1201(g), and 3559(f)(2) (Count VII) and the transportation of a person (Hannah) across state lines with intent to engage in illegal sexual activity, in violation of 18 U.S.C. § 2421(a) (Count I).

Stackhouse waived his right to a jury trial. After a bench trial, the district court convicted Stackhouse on all seven charges. He now appeals his convictions on Counts I and VII.

## II. Discussion

Stackhouse brings an as-applied challenge to his conviction under the federal kidnapping statute, arguing that the application of the statute to an intrastate kidnapping violates the Commerce Clause. With respect to his conviction for transportation across state lines with intent to engage in illegal sexual activity, he argues that there is insufficient evidence of the intent element of the crime.

An as-applied constitutional challenge to a statute is reviewed de novo. *United States v. Mahon*, 804 F.3d 946, 950 (9th Cir. 2015). Although Stackhouse did not raise his constitutional challenge below, the government recognizes that he may raise the issue for the first time on appeal. *See United States v. Parker*, 761 F.3d 986, 991 (9th Cir. 2014).[2] We review the sufficiency of the evidence supporting a conviction de novo. *United States v. Johnson*, 874 F.3d 1078, 1080 (9th Cir. 2017). "For a challenge to the sufficiency of the evidence following a bench trial, we review 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Laney*, 881 F.3d 1100,

---

[2] *Parker* did not address what standard of review applies when a constitutional challenge is raised for the first time on appeal. Because the government does not argue that plain-error review applies, and because we would uphold Stackhouse's convictions under the less deferential de novo standard, we review his constitutional challenge de novo.

1106 (9th Cir. 2018) (quoting *United States v. Atkinson*, 990 F.2d 501, 502–03 (9th Cir. 1993) (en banc)).[3]

### A. The Kidnapping Statute and the Commerce Clause

### 1. As-Applied Challenge

Stackhouse challenges his conviction for the kidnapping of V.G. on the ground that Congress lacks the power to criminalize a kidnapping occurring entirely intrastate, where the statute of conviction proscribes the use of an instrumentality of commerce in carrying out the kidnapping, but the kidnapping is not economic in nature and no effect upon interstate commerce is shown. The government maintains Stackhouse's conviction was a valid exercise of Congress's power to regulate the instrumentalities of interstate commerce.

Article I, section 8 of the Constitution grants Congress the power "[t]o regulate commerce . . . among the several states." *United States v. Lopez* identified "three broad categories of activity that Congress may regulate under its commerce power": (1) "channels of interstate commerce"; (2) "instrumentalities of interstate commerce"; and (3) "activities that substantially affect interstate commerce." 514 U.S. 549, 558–59 (1995).

---

[3] Stackhouse moved for acquittal at the close of the government's evidence, albeit on different grounds than those raised here. Although the defense did not renew the motion after introducing its only witness, "no motion for acquittal is necessary in a bench trial in order to preserve for appeal a challenge to the sufficiency of the evidence." *Atkinson*, 990 F.2d at 503.

Stackhouse was convicted under the federal kidnapping statute, which imposes criminal penalties upon:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away . . . any person, . . . when—the person is willfully transported in interstate or foreign commerce, . . . or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

18 U.S.C. § 1201(a)(1). The statute thus identifies three bases for federal jurisdiction: the transport of the victim across state lines, the movement of the offender interstate, or the use of instrumentalities of interstate commerce in committing or in furtherance of the offense.

The parties agree Stackhouse did not transport V.G. across state lines, nor did he otherwise travel in interstate commerce during the commission of the offense. The government contends that Stackhouse's conviction falls within the second *Lopez* category: use of instrumentalities of commerce—asserted to be the cellphone, car, and hotel—in furtherance of the kidnapping. We conclude that the application of § 1201(a) was constitutional with respect to Stackhouse's use of a cellphone, and so do not consider the other asserted instrumentalities of commerce.

Stackhouse agrees that a cellphone is an instrumentality of interstate commerce, with good reason. "Telephones are instrumentalities of interstate commerce that fall within the second *Lopez* category." *United States v. Nader*, 542 F.3d

713, 717 (9th Cir. 2008). We have applied this principle equally to landlines and cellphones. *See United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997).[4]

While recognizing that cellphones are instrumentalities of interstate commerce, Stackhouse contends, first, that Congress's commerce power under the second *Lopez* category does not reach statutes forbidding "the use of an instrumentality" to commit a separate offense. According to Stackhouse, § 1201(a) does not fall within the second *Lopez* category because what the statute regulates is kidnapping, not the instrumentality used to carry out the kidnapping. That proposition is contrary to the Supreme Court's modern Commerce Clause cases, this court's precedents, and the holdings of numerous cases from other federal courts of appeals, as well as the language of § 1201(a).

---

[4] Courts have found that the transmission of a cellular signal engages interstate communications equipment. *See United States v. Weathers*, 169 F.3d 336, 342 (6th Cir. 1999) (upholding a conviction under the murder-for-hire statute where the use of a cellphone to conduct an intrastate call involved the transmission of interstate signals). Furthermore, under the federal wiretapping statute, 18 U.S.C. § 2518, cellular telephone service is considered to be a "wire communication," *see id.* § 2510(1), because "cellular telephone service, despite its apparent wireless nature, . . . uses wire and cable connections to connect calls." *In re Application of the United States for an Ord. Authorizing Roving Interception of Oral Commc'ns*, 349 F.3d 1132, 1139 (9th Cir. 2003). Calls made via cellphone are transmitted via radio to a cell site, from which the signals travel over fixed links to a telephone switching station. S. REP. No. 99-541, at 9, 11 (1986). We need not decide whether the radio transmission alone would be a sufficient use of interstate communication facilities, but we note that radio communication has been subject to federal regulation almost from its inception. *See* Radio Act of 1927, ch. 169, 44 Stat. 1162.

As to whether the use of a cellphone in furtherance of an intrastate crime is a sufficient basis under the Commerce Clause for a federal offense, *Lopez* emphasized that "Congress is empowered to regulate and protect the instrumentalities of interstate commerce . . . even though the threat may come only from intrastate activities." 514 U.S. at 559. Congress's power extends to instrumentalities of commerce because they "are the ingredients of interstate commerce itself." *Gonzales v. Raich*, 545 U.S. 1, 34 (2005) (Scalia, J., concurring in the judgment). Forbidding the use of instrumentalities of commerce, including cellphones, to further intrastate crime, including kidnapping, is "regulat[ing]" one aspect of the device—its use in certain circumstances. U.S. const., art. I, sec. 8. As the Eleventh Circuit has explained:

> Plainly, congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature. Congress has repeatedly used this power to reach criminal conduct in which the illegal acts ultimately occur intrastate, when the perpetrator uses the channels or instrumentalities of interstate commerce to facilitate their commission.

*United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005) (citations omitted).

Our caselaw confirms that the second *Lopez* category is not limited to statutes directly regulating instrumentalities of commerce. In *United States v. Dela Cruz*, we upheld 18

U.S.C. § 844(e) as applied to a bomb threat conveyed via a phone call within a U.S. territory. 358 F.3d 623, 625 (9th Cir. 2004). That statute prohibits bomb threats made "*through the use* of the mail, telephone, telegraph, or other instrument of interstate or foreign commerce." 18 U.S.C. § 844(e) (emphasis added). What is regulated by § 844(e) is the use of a telephone or "other instrument" to make the threat. *Dela Cruz* upheld the statute as a valid exercise of Congress's power to regulate instrumentalities of commerce under *Lopez*. 358 F.3d at 625; *accord United States v. Corum*, 362 F.3d 489, 494–95 (8th Cir. 2004); *United States v. Gilbert*, 181 F.3d 152, 158–59 (1st Cir. 1999).

*United States v. Nader* is in accord. 542 F.3d at 717. *Nader* upheld convictions under the Travel Act, which prohibits the "use[ of] the mail or any facility in interstate commerce, with intent to—(1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote . . . any unlawful activity." 18 U.S.C. § 1952(a).[5] Like the bomb threat statute, the Travel Act regulates the *use of* instrumentalities of commerce to commit a distinct offense, not the instrumentality itself without regard to its use. The defendants in *Nader*, for example, were convicted based upon their use of phone calls to run a prostitution business. 542 F.3d at 715–16. The appellants, *Nader* said, "correctly d[id] not contest that Congress has the power to regulate intrastate telephone calls" used to further unlawful intrastate activity because "[t]elephones are instrumentalities of interstate commerce that fall within the second *Lopez*

---

[5] "Unlawful activity" under the Travel Act includes gambling, distribution of controlled substances, and prostitution, among other activities. 18 U.S.C. § 1952(b).

category." *Id.* at 717 (emphasis omitted). Both *Dela Cruz* and *Nader*, then, recognize that proscribing the use of telephones and other instrumentalities of commerce to commit or further intrastate crime is regulation of instrumentalities of commerce valid under *Lopez*'s second category.

The kidnapping statute provides that "[w]hoever . . . *uses* the mail or any means, facility, or instrumentality of interstate or foreign commerce *in committing or in furtherance of the commission* of the offense" is subject to criminal penalties, 18 U.S.C. § 1201(a) (emphasis added), paralleling the language of the bomb threat statute and the Travel Act. The parallel language to that in *Dela Cruz* and *Nader* compels parallel results, leading us to conclude the kidnapping statute is valid under the Commerce Clause where a cellphone is used in committing or in furtherance of the kidnapping.[6]

Other circuits have similarly recognized that "as long as the instrumentality itself is an integral part of an interstate system, Congress has power, when necessary for the protection of interstate commerce, to include intrastate activities within its regulatory control." *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 738 (10th Cir. 1974), *abrogated on other grounds by Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). The Fifth Circuit in *United States v. Marek*, for example,

---

[6] We note that neither *Nader* nor *Dela Cruz* required a showing that the transmission of the particular telephone call at issue was interstate rather than intrastate. No issue about the nature of the cellphone transmission or origin has been raised here. *See Nader*, 542 F.3d at 716; *Dela Cruz*, 358 F.3d at 625; *see also United States v. Giordano*, 442 F.3d 30, 38–41 (2d Cir. 2006); *United States v. Richeson*, 338 F.3d 653, 660–61 (7th Cir. 2003); *United States v. Marek*, 238 F.3d 310, 320 (5th Cir. 2001).

reasoned that "[w]hen Congress regulates and protects under the second *Lopez* category, . . . federal jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement." 238 F.3d at 317. And in reviewing a conviction under 18 U.S.C. § 2422(b), prohibiting the use of "any facility or means" of interstate commerce to entice minors into sexual activity, the Eleventh Circuit noted that the Commerce Clause power "includes prohibiting the use of commercial instrumentalities for harmful purposes even if the targeted harm 'occurs outside the flow of commerce' and 'is purely local.'" *United States v. Faris*, 583 F.3d 756, 758–59 (11th Cir. 2009) (per curiam) (quoting *Ballinger*, 395 F.3d at 1226).

Our conclusion that the Commerce Clause permits Congress to regulate intrastate kidnappings in particular where an instrumentality of commerce is used intrastate also aligns with decisions of other courts of appeal. The Sixth Circuit has concluded that the commerce power extends to the intrastate use of a cellphone in committing an intrastate kidnapping. *United States v. Windham*, 53 F.4th 1006, 1011–13 (6th Cir. 2022). Similarly, the Tenth Circuit has upheld convictions under § 1201(a)(1) where the defendants used a cellphone, the Internet, and a GPS device to carry out a kidnapping intrastate. *United States v. Morgan*, 748 F.3d 1024, 1032 & n.8 (10th Cir. 2014).

We conclude that the application of the kidnapping statute here falls within the second *Lopez* category. We therefore need not address Stackhouse's argument that the government was required to show that the kidnapping was economic in nature or had a substantial effect on interstate commerce. Whether an activity is "economic in nature" is relevant to determining whether an activity has a substantial

effect on interstate commerce under *Lopez*'s third category, *see Taylor v. United States*, 579 U.S. 301, 306 (2016); *United States v. Morrison*, 529 U.S. 598, 610–13 (2000); *Lopez*, 514 U.S. at 559–60, not to the "instrumentality of commerce" category. Where Congress regulates an instrumentality of commerce under the second *Lopez* category, "no further inquiry is necessary to determine that their regulation . . . is within the Commerce Clause authority." *Clayton*, 108 F.3d at 1117. More specifically, "[b]ecause a telephone is an instrumentality of interstate commerce, no substantial effects inquiry is needed." *Dela Cruz*, 358 F.3d at 625*; see also Corum*, 362 F.3d at 494.

### 2.  Sufficiency of the Evidence

Stackhouse contends that there is insufficient evidence that the kidnapping was economic in nature or had a substantial relation to interstate commerce. As we concluded above, because Stackhouse's conviction falls within the second *Lopez* category as a regulation of the instrumentalities of interstate commerce, the government was not required to prove that the kidnapping was economic in nature or had a substantial relation to interstate commerce.

Stackhouse does not argue that the government presented insufficient evidence that he used a cellphone, or any other instrumentality of commerce, "in committing or in furtherance of the kidnapping." 18 U.S.C. § 1201(a). We therefore do not consider that issue.

### B.  Transportation Across State Lines

Stackhouse next challenges his conviction under 18 U.S.C. § 2421(a), contending that there was insufficient evidence that he travelled interstate with the intent to commit sexual assault.

### 1. Intent Element

Section 2421(a) applies to anyone who "knowingly transports any individual in interstate or foreign commerce . . . with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so." 18 U.S.C. § 2421(a).[7]

To satisfy the intent element under § 2421(a), "the government must prove beyond a reasonable doubt that a dominant, significant, or motivating purpose of the transportation of the individuals was to engage in criminal sexual activity." *United States v. Flucas*, 22 F.4th 1149, 1164 (9th Cir. 2022). The criminal purpose need not be the "sole purpose" of the interstate travel, *id.* at 1155, nor a but-for cause of the transportation, *United States v. Lindsay*, 931

---

[7] The Mann Act, Pub. L. No. 61-277, ch. 395, 36 Stat. 825 (1910) (codified as amended at 18 U.S.C. §§ 2421–24), was adopted to address the conscription of women into prostitution. *See Mortensen v. United States*, 322 U.S. 369, 377 (1944). Before it was amended in 1986, § 2421 prohibited the "knowing[] transport[ation] in interstate . . . commerce . . . [of] any woman or girl for the purpose of prostitution or debauchery . . . or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute." *United States v. Sabatino*, 943 F.2d 94, 99 (1st Cir. 1991) (quoting ch. 395, 36 Stat. at 825). The 1986 amendments altered the statutory language to apply to "any individual," rather than "any woman or girl," and to alter the objects of the defendant's intent; rather than debauchery, the intended activity must be "prostitution, or . . . any sexual activity for which any person can be charged with a criminal offense." *Id.* (quoting Pub. L. 99-628, § 5(b)(1), 100 Stat. 3511, 3511–12 (1986)). Both versions of the statute require intent to engage in illicit or criminal activity. Cases interpreting the intent element under the pre-1986 statute apply equally to the amended § 2421, as well as to the parallel provision under § 2423, which regulates the interstate transportation of minors with intent to engage in criminal sexual activity, among other offenses.

F.3d 852, 864 (9th Cir. 2019) (analyzing 18 U.S.C. § 2423(b)).

Contrary to the parties' assertions, a conviction under § 2421 does not require that criminal sexual activity in fact occurred. "[G]uilt under the Mann Act turns on the purpose which motivates the transportation, not on its accomplishment." *Cleveland v. United States*, 329 U.S. 14, 20 (1946). Because the act regulated is the "transport[ation of] any individual in interstate or foreign commerce," the offense is complete once the transportation occurs. *See Wilson v. United States*, 232 U.S. 563, 570–71 (1914); *United States v. Beach*, 324 U.S. 193, 195 (1945); *Reamer v. United States*, 318 F.2d 43, 49 (8th Cir. 1963); *United States v. Marks*, 274 F.2d 15, 18–19 (7th Cir. 1959).

In any event, Stackhouse agrees that the government offered evidence that would support a conviction for illegal sexual activity under Colorado law with respect to the nonconsensual anal penetration he committed against Hannah.[8] His argument is that he did not form the intent to commit the assault, or any other illegal sexual act, before the interstate travel.[9] Instead, he asserts that he formed the intent

---

[8] According to the government, Stackhouse could have been charged with criminal sexual assault under Colorado Revised Statute § 18-3-402(1)(a) (2013). At the time of the offense, § 18-3-402(1)(a) read: "Any actor who knowingly inflicts sexual intrusion or sexual penetration on a victim commits sexual assault if: The actor causes submission of the victim by means of sufficient consequence reasonably calculated to cause submission against the victim's will."

[9] Although *Mortensen* stated that the intent must "exist before the conclusion of the interstate journey," 322 U.S. at 374, we later "disapprove[d] of the use of [*Mortensen*'s] language relative to the time an unlawful intent must be formed," instead concluding that "[t]he

to commit the assault immediately before it occurred—and after the interstate transportation was complete—when Hannah informed him that she had had penetrative sex with O'Neill against Stackhouse's instructions.

In appropriate circumstances, the fact that an assault later occurred could perhaps be sufficient by itself to permit an inference that a defendant intended to commit the offense before crossing a state line. We need not consider whether such a bare inference is appropriate here, as the defendant's conduct both in the past and immediately before and after the interstate journey provides sufficient insight into his state of mind at the time of transportation to allow a finding beyond a reasonable doubt that Stackhouse intended Hannah's sexual assault when he drove into Colorado.

For one thing, caselaw establishes that a pattern of sexually assaultive conduct can support an inference of intent to commit sexual assault while travelling interstate before the assault. In analyzing a conviction for transportation for the purpose of prostitution under § 2421, this court in *Baker v. United States* stated: "Among the circumstances which may be considered in determining whether such an intent existed . . . are that there were other similar activities by the accused, showing a pattern of conduct, [and] that, at the end of the journey the female was taken by the accused to a house of prostitution." 310 F.2d 924, 931 (9th Cir. 1962) (internal citation omitted). In *United*

---

preferable practice is to instruct that the unlawful intent must be formed before crossing a state line." *United States v. Fox*, 425 F.2d 996, 1000 (9th Cir. 1970). This timing distinction makes no difference here. Nothing in the record suggests that Stackhouse had a different state of mind when crossing into Colorado than he did at the conclusion of his journey at O'Neill's home.

*States v. Wesson*, we similarly concluded that the purpose element under § 2421 was met where the defendant repeatedly raped and beat the victim and offered her services as a prostitute over the radio while travelling by truck across state lines. 779 F.2d 1443, 1444 (9th Cir. 1986) (per curiam). And in *United States v. Kinslow*, we found sufficient evidence of the defendant's intent when transporting a minor across state lines to commit sexual misconduct upon arrival, in violation of § 2423, where the defendant sexually assaulted the minor victim's mother shortly before the act of transport. 860 F.2d 963, 967–68 (9th Cir. 1988), *overruled on other grounds by United States v. Brackeen*, 969 F.2d 827, 829 (9th Cir. 1992); *see also Tedesco v. United States*, 118 F.2d 737, 741–42 (9th Cir. 1941); *United States v. Snow*, 507 F.2d 22, 25 (7th Cir. 1974); *Marks*, 274 F.2d at 18; *Dunn v. United States*, 190 F.2d 496, 498 (10th Cir. 1951).

Evidence of Stackhouse's interactions with other women similarly supports inferring his intent before arriving in Colorado to sexually assault Hannah. The government introduced testimony by three women whom Stackhouse sexually assaulted or threatened to assault in 2019 and 2020, under circumstances similar to those surrounding his interaction with Hannah.[10] All three encounters took place in hotel rooms and involved women under the influence of

---

[10] The government provided notice of its intent to introduce evidence of prior acts under Federal Rules of Evidence 404(b) and 413. Evidence of prior acts may be introduced under Rule 404(b) for the limited purpose of proving intent. *United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991). Under Rule 413, "a party may admit evidence of a sexual assault in order to prove that the defendant has the propensity to commit another sexual assault." *United States v. Redlightning*, 624 F.3d 1090, 1119–20 (9th Cir. 2010). The defense does not argue on appeal that such evidence was improperly admitted or challenge the constitutionality of Rule 413.

drugs, some provided by Stackhouse. Stackhouse suggested to one of the victims that she owed him sexual favors as repayment for the drugs. He threatened one woman at gunpoint, and indicated to another that he had a gun. Stackhouse raped one of the victims while she was unconscious, and another after threatening to beat her and to sell her into prostitution. The testimony provides ample evidence that Stackhouse repeatedly forced women into sexual encounters using violence and coercion. A factfinder could rely in part on such evidence to infer that Stackhouse had the intent of similarly engaging in nonconsensual sex with Hannah when he brought her to Denver.

Considered in the light most favorable to the prosecution, Stackhouse's actions leading up to and during the second trip to Denver further support an inference of an intent to sexually manipulate, coerce, and control Hannah upon arrival. During the initial trip, Stackhouse plied the victim with cocaine and alcohol and told her that she owed him sexual favors as repayment. Hannah accompanied Stackhouse on the second trip to Denver because she felt "scared" of him, in part because he had taken a photo of her ID and knew where she lived. During the second trip, Stackhouse drove Hannah directly to O'Neill's house, where he instructed her to perform sex acts against her wishes. He then engaged in non-consensual sex as a form of punishment for disobeying his instructions related to Hannah's sexual interactions with others. Taken as a whole, a factfinder could conclude that Stackhouse's actions were calculated to coerce Hannah into sexual encounters against her will. That is, considering the context of the trip, it is "apparent that [Stackhouse] contemplated that the sex might not be consensual and that force would be necessary." *United*

*States v. Bonty*, 383 F.3d 575, 578 (7th Cir. 2004) (upholding a conviction under § 2423).

## 2.  Contingent Intent

Even if Stackhouse intended when crossing into Colorado to sexually assault Hannah under some circumstances, Hannah's account of what happened—including that Stackhouse told her "this is what happens when [she doesn't] listen to him" before anally penetrating her—suggests that Stackhouse may have intended to sexually assault her only *if* she did not comply with his directions and demands. So the question arises whether to be convicted under § 2421, Stackhouse must have had an unconditional intent to commit a sexual crime when crossing the state line.

In *Holloway v. United States*, the Supreme Court recognized contingent intent as sufficient for a criminal conviction under the federal carjacking statute, 18 U.S.C. § 2119. *See* 526 U.S. 1, 6–8, 12 (1999). That statute criminalizes the forceful taking of a motor vehicle "with the intent to cause death or serious bodily harm." 18 U.S.C. § 2119. *Holloway* concluded that "a person who points a gun at a driver, having decided to pull the trigger *if the driver does not comply* with a demand for the car keys, possesses the intent, at that moment, to seriously harm the driver." 526 U.S. at 6 (emphasis added). To require the defendant to possess an *un*conditional intent to kill or harm "would improperly transform the *mens rea* element . . . into an additional *actus reus* component of the carjacking statute." *Id.* at 8.

The Court based its conclusion on the reasoning that "intent" is most naturally read to encompass conditional as well as unconditional intent, as well as on the overall

purpose of the statute—to deter criminal activity—and the assumption that Congress would be familiar with the established principle that intent may be conditional. *Id.* at 7–9. Those justifications apply equally to the federal kidnapping statute.

The *Holloway* Court noted, in particular, that state courts have long upheld convictions based upon contingent intent. *Id.* at 10 & n.9. In *People v. Vandelinder*, a Michigan appellate court, for instance, upheld a conviction for solicitation to murder where the defendant instructed a hired kidnapper to kill his wife *if* she declined the terms of his demands. 192 Mich. App. 447, 450–51 (1992). In *Commonwealth v. Richards*, the Massachusetts Supreme Judicial Court similarly determined that an intent to murder "*should it become necessary* to effectuate the robbery or make good an escape" was sufficient for assault with intent to murder. 363 Mass. 299, 308 (1973) (emphasis added). In *People v. Miley*, a California appellate court upheld a conviction for solicitation to murder where the defendant gave an instruction to kill the witnesses *if they were home*, 158 Cal. App. 3d 25, 33–34 (1984); and in *People v. Connors*, the Illinois Supreme Court approved of a conviction for assault with intent to murder of a union organizer who threatened to kill a worker *if* he did not walk off the job, 253 Ill. 266, 273, 280 (1912). The same principle has been adopted by the Model Penal Code (MPC), which specifies "[w]hen a particular purpose is an element of an offense, the element is established although such purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense." General Requirements of Culpability, Model Penal Code § 2.02(6). *See also* Del. Code Ann. tit. 11, § 254 (adopting

similar language to the MPC); Haw. Rev. Stat. § 702-209 (same); 18 Pa. Stat. and Cons. Stat. Ann. § 302(f) (same).

That principle applies here. On the evidence before us, Stackhouse's intent can arguably be characterized as an intent to have sex with Hannah without her consent if she did not comply with his demands and directions. The condition imposed was not one that "negatives the harm or evil sought to be prevented," Model Penal Code § 2.02, as the condition that the victim have sex with Stackhouse regardless of her consent is the kind of harm sought to be prevented by the Mann Act. The intent element is not negated "by requiring the victim to comply with a condition the defendant has no right to impose," *Holloway*, 526 U.S. at 11, here, the condition that she have sex with another man (and his wife) in the way Stackhouse directed. So the fact Stackhouse may not have had an unconditional intent to commit sexual assault when he drove Hannah to Colorado does not undermine a finding of intent under § 2421. *Accord Bonty*, 383 F.3d at 578.

The Seventh Circuit specifically so held in a closely parallel case. In *Bonty*, the defendant argued that he "only intended to have consensual sex with [the victim]" when crossing state lines, and that "it wasn't until *after* the [victim] unexpectedly declined his sexual advances" after he had arrived at his destination "that it occurred to him to use force." *Id.* Based on the circumstances of the encounter, the court, as noted earlier, concluded that the defendant had "contemplated that the sex might not be consensual and that force would be necessary." *Id.* Thus, the intent element of § 2421 was satisfied because the defendant "intended to have sex with [the victim] . . . either (1) with her consent, or (2) by force." *Id.*

In sum, that Stackhouse may have intended to assault Hannah contingently—if the victim did not fully comply with his demands—is sufficient to meet the intent element of § 2421. Combining the adequacy of contingent intent with the evidence the government introduced—establishing Stackhouse's pattern of assaultive behavior and prior interactions with other women, as well as his behavior leading up to and during his second trip to Denver with Hannah—there was sufficient evidence to convict Stackhouse of the § 2421 violation. We affirm that conviction.

### III. Conclusion

We hold that the application of § 1201(a) to an intrastate kidnapping where the defendant uses a cellphone in furtherance of the offense is a valid exercise of Congress's authority to regulate the instrumentalities of interstate commerce. We further hold that the government presented sufficient evidence of the defendant's intent to commit sexual assault when he transported the victim of his assault across state lines in violation of § 2421.

**AFFIRMED.**